JENNIE E. FAGAN, Appellee, v. LEVI M. FAGAN, Appellant.

DIVORCE: Grounds — Desertion—Willfulness Necessary. Married
1 people may live apart if they wish, and by doing so do not lay the foundation for divorce on the ground of desertion, no matter how long continued; and the party seeking a divorce must, under the statute, show willful desertion and absence without reasonable cause for the space of two years.

DIVORCE: Grounds—Desertion — Agreement to Separate—Refusal
2 to Renew Marital Relations. Where the separation of a husband and wife is mutually agreed upon, neither can invoke the statute as to desertion, for the purpose of securing a divorce, until some attempt is made to renew the marital relations; and, when such request is made and refused, then for the first time the statutory period begins to run.

HUSBAND AND WIFE: Mutual Rights, Duties, Etc.—Interference
3 of Children in Family Management. The wife has the first place in the home, so far as the management and control are con-

cerned; and where the conduct of the children is such as to interfere with her sovereignty over the home, it is the husband's duty, when appealed to, to recognize such right, and to speak in her behalf, and to secure her that recognition.

DIVORCE: Grounds—Desertion—Evidence. Evidence reviewed, in 4, 6 an action for a divorce on the grounds of desertion, and *held* that the husband's conduct manifested a purpose on his part to permanently separate himself from all the duties and obligations, contractual and otherwise, that rested upon him as a husband, and that he maintained such mental attitude for two years.

DIVORCE: Grounds—Desertion—Evidence. Where a husband and 5 wife had separated, and the wife asked to return, under proper conditions, and the husband told her that she could come back as one of the girls, but would not agree that she was to have the first place in the home, so far as its management and control were concerned, and said she would have to submit to his daughter's domination, the conditions attached to the return were such as no self-respecting wife could entertain, and it was not a good-faith offer on his part to take her back into his home, after sending her off, penniless and alone.

DIVORCE: Grounds—Desertion—Evidence.
4, 6

*Appeal from Calhoun District Court.*—E. G. ALBERT, Judge.

SEPTEMBER 16, 1919.

BOTH parties seek a divorce on the ground of desertion. Opinion states the facts. Decree for the plaintiff in the court from which the appeal is taken. Defendant appeals. —*Affirmed.*

*Gray & Gray,* for appellant.

*E. C. Stevenson,* for appellee.

GAYNOR, J.—In this action, plaintiff asks a divorce on the ground of desertion. Defendant, in a cross-petition, also asks a divorce on the same ground. The grounds upon

which plaintiff predicates her right to a divorce are not clearly defined in her petition. It is asserted by her in argument that divorce is sought on the ground of desertion. Her petition, however, so commingles charges of cruel and inhuman treatment with the charge of desertion that we find it necessary to construe the whole record, to ascertain the real grounds upon which she rests her claim. After a complete examination of the record, we are led to the thought that the charges of cruel and inhuman treatment, and the proof offered to establish these charges, fall so far short of the statutory requirement that they must have been made and intended only as explanatory of the conduct of the plaintiff in leaving defendant, and in living separate and apart from him. We take it, therefore, that the real charge upon which the plaintiff predicates her action for divorce is that defendant willfully deserted her, and absented himself without a reasonable cause for the space of two years. So it is apparent that each is seeking divorce from the other on the same ground. The trial court dismissed defendant's cross-petition, and granted the plaintiff a divorce and alimony. From this the defendant appeals.

The record discloses that plaintiff and defendant were married on the 1st day of September, 1915, and lived together as husband and wife, in the defendant's home, until the 23d day of February, 1916. Each had been married before, and each had children. At the time of this marriage, the plaintiff was about 39 years of age, and the defendant was about 62. They had known each other about 8 years. Defendant had two daughters and one son living at home. At the time of the marriage, plaintiff lived in Rockwell City. The defendant lived on a farm, a short distance from Rockwell City. After the marriage, plaintiff and her son took up their home with the defendant and his family on the farm, and continued to reside there until the 23d day of February, 1916, about 6 months. During that time, all the

differences or unpleasantnesses that occurred between the plaintiff and the defendant seemed to be the outgrowth of the mingling of the two families, the children, unconsciously it would seem, playing prominent parts. There were no volcanic eruptions, but a settled and, we think, a permanent condition of hostility. Each seemed to be possessed of a desire to be recognized as the commanding figure in the household. The manifestations of this were trivial. No harshness in either language or conduct occurred, to give evidence of any intent or purpose to willfully inflict any sort of violence upon the other. The society of neither, however, afforded the other comfort or pleasure. Each seems to have punctiliously discharged the ordinary duties incident to home life. The marriage undoubtedly was one of convenience. It appears that the defendant's first wife had been dead several years before he entered into this marriage. During this interval, his elder daughters managed his household until they married and left, to make homes for themselves. Two daughters remained. The elder of these, Sue, had, for several years after the marriage of her sisters, conducted the home for the defendant. She was, at the time of this marriage, about 21 years of age, and was a capable and thrifty person. The father had looked to his daughters for many years for the comforts and pleasures of home life. This daughter did not readily yield supremacy to the new wife, though she seems not to have openly denied her rightful authority. This irritated the plaintiff, though there seems to have been no open rupture between them. Plaintiff, however, felt no doubt that she was not given supreme command of the household after the marriage. She complains that the husband consulted the daughter, touching the making out of bills for household needs; that he addressed the daughter touching preparation of meals while the wife was present. This disturbed the plaintiff,—at least, she seems to have resented

his conduct in so doing; but these things were trivial, and seemed not to have been thought of or discussed at any time after they occurred; and the defendant, on the stand, expressed some surprise that these trifling matters were held against him, and used to his discredit upon the trial. But there is no need for us to discuss this phase of the home life. Giving to plaintiff's evidence the fullest measure of credence, the conduct of the defendant was in no sense cruel, and in no sense could be considered as endangering her life. It is, however, certain that, during these six months, the attitude of each had changed towards the other, and neither found pleasure or comfort in the society of the other. She left and moved to Rockwell City February 23, 1916. Defendant continued to reside on his farm with his children. She remained in Rockwell City in her own home, apart from the defendant, until this action was brought. She supported herself by her own labor, and neither asked nor received any assistance from the defendant. Immediately upon her leaving the defendant, he published the following notice:

"To whom it may concern:

"You and each of you are hereby notified that my wife, Jennie Fagan, has left my home, my bed and board without any just cause and you are further notified that I will not be responsible for any debts that she may contract and I warn all persons from trusting her in my account.

"Dated this 24th day of February, 1916."

In January, 1917, defendant purchased a home in Rockwell City, and moved his family there. This home was purchased in the name of his daughter Susan, and was situated but a short distance from the home occupied by the plaintiff. No communication took place between this husband and wife after she left, until about the time he moved his family to Rockwell City. The only meeting between the parties after she left occurred a short time before he moved

his family to Rockwell City. Her testimony on this point is as follows:

"I didn't see or talk to Mr. Fagan for almost a year after I came back. He was living on the farm in Cedar Township. He came to my house. I went to the door, and he said, 'How do you do?' I fainted in the doorway, and he said, 'What is the matter?' When I came to, he had picked me up, and I was sitting in a chair. He said, 'I didn't know that you had such spells as this. Did I cause it?' and I says 'I guess you did.' Then he says, 'How do you feel?' and I says, 'I don't feel very good yet;' and he sat there a while, and said, 'Do you feel better now?' and I said, 'Yes;' and he says, 'Well, I guess I will go then.' That was the first time I talked with him since I left him. The next time was about a year after."

It appears that, on or about the 4th of February, 1918, the plaintiff sent the following letter to the defendant:

"As you know, I moved to Rockwell City at your request. You invited me to leave, and refused to allow me to live with you, and refused to support me and treat me as your wife. You have never contributed one cent to my support since my return to Rockwell City, and you even published a notice in the paper that you would not pay any bills contracted by me. I have always been ready to do my part as your wife, and have always done my part as a dutiful wife; but you have not done your part as a husband, as you very well know. I would like to know whether you are going to carry out your contract and live with me and treat me as your wife. I am ready and willing to do my part and live with you if you will let me do so. Please let me hear what you will do, and whether you want me to live with you as your wife."

Defendant received this letter, and some time after he received it, he came to the plaintiff's house. Her testimony on this point is:

"I went to the door, and says, 'How do you do?' and he says, 'How do you do?' and I said, 'What is it?' and he says, 'It is this. You can come back as one of the girls.' I says, 'No, sir, I will come back as your wife, and be the head of the home, or I will not come back at all.' He says, 'You don't know as much about running the home as my girls do. You know how to run your home, but not mine.' I said, 'What do you want?' He said, 'I came to see how you were making it.' I says, 'I am working every day.' He said, 'Where, here at home?' I says, 'No, I am going out, and working by the day. I must live, and I must make money to live on.' 'Well,' he says, 'you come back as one of the girls.' I says, 'No, sir, if I come back, I will go back as your wife.' He wanted to know what kind of an answer I would give him, and I said, 'I will think about it.' "

This conversation occurred about the 11th or 12th of February, 1918. No further communication occurred between the parties. This action was begun on the 8th of April, 1918. Her home, at the time, was about two blocks south and one-half block west of the defendant's home in Rockwell City. So it is apparent that these parties had lived apart, in separate homes, without marital relationship, for more than two years before this action was commenced. The plaintiff claims that the defendant deserted her, and the defendant claims that she deserted him.

This brings us to a consideration of the evidence bearing upon the causes which led to the separation. As we have said before, there was nothing in the conduct of either that would justify a court in granting a legal separation. Married people, however, may live apart if they wish to do so. This, however, does not lay the foundation for a divorce on the ground of desertion, no matter how long continued. The wording of the statute is specific, and the party seeking a divorce upon the ground of desertion must

1. DIVORCE: grounds: desertion: willfulness necessary.

bring himself within the provision of the statute. The wording of the statute is:

"When he willfully deserts his wife and absents himself without a reasonable cause for the space of two years." Section 3174, Code, 1897.

The testimony as to the immediate cause of the separation, as to why she left his home on the farm and moved to Rockwell City to a home of her own, is best stated in the language of the parties. She testifies that the defendant said, in February, 1916:

" 'I see that you and Sue [meaning the daughter who was living at home] cannot get along, and you had better go. You and Sue both have been running a house so long that you each still want to be boss, and one will not give in for the other; and you won't give in, so the best thing you can do is to pack up your things and I will haul you back to Rockwell City.' I said, 'I hate to go back and face my friends again.' He said, 'It isn't any worse for you than for me.' I said, 'I will have to work again, and work by the day,' and he said, 'I will give you $500, and that will help a little.' This he never did. When he said, 'I see you and Sue cannot get along together,' I said, 'Yes, sir.' When he said, 'I think you better go.' I said, 'Yes, sir.' When he said, 'I will haul your things back to Rockwell City,' I said, 'Yes, sir.' I told him I didn't like to go back and face my friends and hard work. He said he didn't think things would turn out like this, and that was the end of the conversation. I cried a little. This was all that was said between Mr. Fagan and myself. We slept together that night. Didn't mention it afterwards. I started to make arrangements to leave. This was about the time he said Sue and I could not get along, and I had better pack up and go. The next day, when I asked him to take my goods back to Rockwell City, he said that he would not do it, but that he would get

some of the neighbors. He didn't say anything about my not going. He afterwards said he would not move me. I had other parties move me. I went down and helped load the goods. Defendant made no objection."

The defendant's testimony on this point is:

"I said this to her: 'Now, Jennie, if you are tired of staying with me, and don't want to stay, and if you do go, whenever you get tired staying there, you can come back.' I didn't say to her 'If you are tired of staying here you can go.' If she wanted to leave, that was her idea. I didn't consider that it was improper conduct towards her not to interfere. I think it was my place, if she was tired staying out there and wanted to go, I thought she could go. I told her son, when he got tired of staying he could go; but I wanted her to stay as long as she would stay and could stay. I couldn't do anything else if she was bound to go. I don't think I told her that I didn't want her to leave. I don't know that I ever protested against her leaving."

He further testified, in one place:

"The first few days before she left, she acted kind of mean, and I thought she was trying to do something so that I would do something to her, but I didn't do it. I kept in as good a humor as I could, and I told her before she left that I didn't think she ought to be the head of the house, the way she was acting, and I said, 'As long as you don't act as you should, I think Sue should run the house.' That was a day or two before she left. I didn't tell her to leave. Sue was 22 years old at the time, and had kept the house since her mother died. My wife died 10 years ago. Sue had charge for 3 or 4 years, after the elder girls got married. One morning before she got up, she says, 'Will you move me back to town?' and I says, 'Sure I will, if you are tired of staying here. I will move your things to town.' After thinking it over, I told her I would not; that I had moved her things out there in good faith, and that if she

wanted them moved back, she would have to take them. I never told her she wasn't boss in the house until a few days before she left, and then I made some remark. I don't remember what it was."

We think this record shows that the plaintiff was dissatisfied with the home life as a member of defendant's family. It appears the defendant was dissatisfied with the home life, due to the jealous rivalry between his daughter and his wife. In some parts of defendant's testimony, he denies that he wanted the plaintiff to leave the home. In other parts, he seemed to concede that it was, in his mind, the best solution of an unfortunate condition. If the separation was mutually agreed upon, neither can invoke the statute until at least some attempt is made to renew the marital relation. If defendant consented to the plaintiff's separation from him, he cannot, without having made request for her return, predicate desertion upon the fact of absence, and the two years would not start to run until such request is made and refused. If plaintiff separated herself, without legal cause, from the defendant, she cannot charge him with desertion, without having made some reasonable effort or offer to return and renew marital relations. The years they lived apart by mutual consent could not be tacked on, to make the statutory period. The duties of the marital relationship are reciprocal, and the rule that bars the husband from seeking a divorce on the ground of desertion, where the separation is with his consent, until he has made some offer of reconciliation and some request for a return, is equally binding on the wife, when, by mutual consent, they separated, and she makes no offer of reconciliation and no request to be permitted to return. When such request is made and refused, then, for the first time, the statutory period begins to run. See *Day v. Day,* 84 Iowa 221; *McElhaney v. McElhaney,*

2. DIVORCE: grounds: desertion: agreement to separate: refusal to renew marital relations.

125 Iowa 279; *Seeds v. Seeds,* 139 Iowa 717; *Arment v. Arment,* 154 Iowa 573; *Tallmon v. Tallmon,* 166 Iowa 370; *Tipton v. Tipton,* 169 Iowa 182.

What caused the separation must be judged by what transpired prior to the separation. Neither had ground for a legal separation at the time the actual separation took place. The real disturbing influence was the fact that the plaintiff conceived the notion that the daughter, Sue, assumed too much authority in the household and was backed by the defendant; that her rightful place as wife had been usurped by the daughter, Sue. No doubt this defendant was fond of his daughter Sue. She had been a good daughter, and helpful to him during the years when he was a widower, and out of this relation grew the embarrassment which caused him to open the door for his wife's departure. We must assume that, legally, the wife had the first place in the home, so far as its management and control were concerned,—that is, first as to the children; and we must assume that it was the duty of the husband, when appealed to, to recognize this right; and we may assume that, if the conduct of the children had been such as to interfere with the plaintiff's sovereignty over the home, it was his duty to speak in her behalf, and to secure to her that recognition to which she was legally entitled. The interference with her sovereignty was real to her. She felt that her prerogatives as wife were being interfered with. He knew she felt that they were. He knew that she was dissatisfied with the conditions that existed in the home, and he did not try to correct them. He may have felt that her feeling was without justification. It may have been, in fact, without justification. Yet it existed, and this feeling on her part disturbed the mind of the defendant; for he, no doubt, loved his children,

3. HUSBAND AND WIFE: mutual rights, duties, etc.: interference of children in family management.

4. DIVORCE: grounds: desertion: evidence.

and desired that they have comfortable entertainment in his home. He had a foreboding of strife between the wife and his daughter Sue. He so expresses himself in his conversation with the wife, when he said:

"You better go. I don't think you ought to be the head of the house, the way you are acting. As long as you don't act as you should, I think Sue should run the house."

There was but one inference that she could legitimately draw from this, and that is that he desired her to leave; to leave Sue in the charge and management of his home. She went because he told her to. He agreed first to carry her stuff to her former home in Rockwell City; agreed to pay her $500; but when she left, he refused to do either. He immediately published the notice hereinbefore set out; neglected to have anything further to do with her; neglected to make any provision for her support; neither contributed nor offered to contribute anything to that end; and finally, when she proposed returning, told her she could come back "as one of the girls." It is evident, then, that, when he told her to go, and she did go, it was his purpose that she should not return as his wife. His conduct in publishing the notice emphasizes that fact. His neglect to visit her shows a purpose to permanently alienate himself from her, to no longer treat her as his wife. It is clear in this record that she preferred to have matters corrected at home. It is clear that he refused to make any effort to correct matters at home. It is clear that he preferred to have her go, and leave him in the quietude of his home, with his daughters. His whole conduct makes manifest a purpose on his part to permanently separate himself from all the duties and obligations, contractual and otherwise, that rested upon him as the husband of this woman. That mental attitude he maintained for two years. That mental attitude found expression in the last meeting be-

fore these proceedings were begun. The
state of his mind at the time of the separa-
tion could not have been made plainer had
he said:

5. DIVORCE:
grounds: deser-
tion: evidence.

"I find you a disturbing element in my home. My daughter for years has been my companion and my home-keeper. You came into the home on my invitation, and now seek to disturb the pleasant relations between me and my daughter. You seek to disturb the quietude of the home. There cannot be two heads to this family. If you cannot submit to my daughter's domination, you better go. I will make no provision for you after you have gone. I will not contribute anything to your support. I will deny the right to others to contribute to your support on my credit. I will not visit you. I will not have anything further to do with you, based on any marital relationship. You can return, but only as one of my daughters can return. You can have a place in my home, but not as my wife. I recognize no other obligation to you than that which the law imposes on me, to give you support in my own family. I do not recognize your rights as wife. I recognize only my obligation to give you support while you remain in my home."

6. DIVORCE:
grounds: deser-
tion: evidence.

He attached a condition to her return which no self-respecting wife could entertain; not a good-faith offer to take her back into his home, after sending her off, penniless and alone.

On the whole record, we think the court appealed from was right in its decree, and its judgment is—*Affirmed.*

LADD, C. J., WEAVER and STEVENS, JJ., concur.